|  |  |
|---|---|
| **MONTVILLE TOWNSHIP BOARD OF EDUCATION,** | Civ. No. 16-4466 (KM) (MAH) |
| **Plaintiff,** | **OPINION** |
| **v.** | |
| **ZURICH AMERICAN INSURANCE CO.,** | |
| **Defendant.** | |

**KEVIN MCNULTY, U.S.D.J.**

This is an insurance coverage dispute between an insured, Montville Township Board of Education ("Montville"), and its insurer, Zurich American Insurance Co. ("Zurich").[1] For twelve years, Montville employed Jason Fennes as a teacher. In June 2010, Fennes resigned. About two years later, while working at another school, Cedar Hill Prep ("Cedar Hill"), Fennes was arrested and indicted. The charges were that he had sexually abused a number of Montville students between 2005 and 2008, and a Cedar Hill student in 2010 and 2011. In 2012, one of Fennes's alleged victims, Child M, a Cedar Hill student, sued (among others) Montville. She alleges that Montville not only knew about Fennes's inappropriate conduct and failed to notify the authorities, but also agreed not to tell potential future employers about that conduct in order to induce Fennes to resign. Montville, she claims, thus enabled and facilitated Fennes's acts of abuse at Cedar Hill. Montville says that Zurich is obligated to defend it against these allegations under its general commercial

---

[1]     Zurich says that the real party in interest is its subsidiary, American Guarantee and Liability Insurance Company ("AGLIC"). Like the parties, I treat AGLIC and Zurich as one and the same.

liability ("GCL") policy. Zurich has declined to do so based on a coverage exception for "abusive acts."

Now before the Court are cross-motions for summary judgment on the issue of Zurich's duty to defend Montville in the Child M litigation. For the reasons stated below, I will deny Montville's motion but grant Zurich's. Because the claims asserted against Montville by Child M are not covered by Montville's policy, Zurich has no duty to defend Montville.

## I.  BACKGROUND[2]

Below is a statement of the factual and procedural posture of this case, as well as the underlying Child M lawsuit. The parties generally agree as to the terms of their insurance contract and the allegations of Child M's complaint, although each draws a different legal conclusion from those facts.

---

[2]    Citations to the record are as follows:

"Pl. Br." — Montville's Brief In Support of its Motion for Summary Judgment, ECF No. 14-3

"Pl. Reply Br." — Montville's Brief in Further Support for its Motion For Summary Judgement and in Opposition to Zurich's Cross-Motion for Summary Judgment, ECF No. 20

"Pl. SUMF" — Montville's Statement of Material Undisputed Facts, ECF No. 14-2

"Def. Resp. SUMF" — Zurich Response to Montville's Statement of Material, Undisputed Facts, ECF No. 17-3

"Def. SUMF" — Montville's Statement of Material Undisputed Facts, ECF No. 17-2

"Pl. Resp. SUMF" — Zurich's Response to Montville's Statement of Material Undisputed Facts, ECF No. 20-1

"Compl." — Third Amended Complaint in *Child M, et al. v. Cedar Hill Prep., et al*, attached as Exhibit B to the Declaration of Stephen J. Edelstein, Esq., ECF No. 14-4

"Policy" — Commercial General Liability Insurance Liability Policy issued to Montville for the period of July 1, 2011, to July 1, 2012, attached as Exhibit C to the Declaration of Stephen J. Edelstein, Esq., ECF No. 14-5

## A. Child M Sues Montville

Montville employed Fennes as a first-grade teacher from September 1998 to June 30, 2010. After his resignation, he was hired by Cedar Hills, where he also worked as a teacher. In March 2012, while employed by Cedar Hills, Fennes was arrested for sexually abusing a Montville student in 2005. Montville notified Zurich of the potential for a claim, and Zurich responded with a general reservation of rights. (Pl. SUMF ¶¶ 5-8 Def. Resp. SUMF ¶¶ 5-8)

In August 2012, Child M and her parents sued Fennes and Cedar Hill.[3] On January 23, 2015, Child M filed a third amended complaint that named Fennes, Cedar Hill, Montville, and others as defendants. In that complaint, Child M alleges that Fennes, her teacher, sexually abused her in February 2012. She was then six years old. (Pl. SUMF ¶¶ 13; Def. Resp. SUMF ¶ 13; Compl. p. 1)

As to Montville, here are the pertinent allegations of the Child M complaint:

- Prior to working at Cedar Hill, Montville employed Fennes as a teacher and track coach at William Mason Elementary School. During the 12 years he worked at Montville, Fennes sexually abused minor students. (Compl. p. 11)

- Montville knew about, or was on notice of, such sexual abuse. Montville nevertheless failed to report Fennes to the appropriate authorities as required by law. (*Id.*)

- Montville entered into an agreement, dated May 4, 2010, with Fennes, in which Montville agreed to "limit the scope of information" it would communicate to potential employers "in exchange for" his resignation. (*Id.* at 12)

---

[3] Two years later, in August 2014, Cedar Hill sued Montville in a separate action (presumably for indemnity and contribution, although the record is unclear). (Pl. SUMF ¶¶ 9-11) Def. Resp. SUMF ¶¶ 9-11)

- Fennes "performed various acts of sexual molestation against" Child M. (*Id.* at 5)

- But for Montville's failure to report and "provide pertinent and highly relevant information" about Fennes to potential employers, such as Cedar Hills, Child M would not have been sexually abused by Fennes. (*Id.* at 12-15)

Based on the same allegations, Cedar Hill filed a cross-claim against Montville for contribution and indemnification.[4] (Pl. SUMF ¶ 14; Def. Resp. SUMF ¶ 14)

## B.    Montville's Insurance Policy

Child M's allegations potentially implicate two coverage parts of Montville's General Commercial Liability ("GCL") policy with Zurich.

The first is the "GCL Coverage Part." This part broadly provides insurance for "bodily injury" caused by an "occurrence." A "bodily injury" is a "bodily injury, sickness or disease sustained by a person. This includes mental anguish, mental injury, shock, fright or death resulting from bodily injury, sickness, or disease." Excluded from coverage, however, is any claim for bodily injury "arising out of or relating in any way to an 'abusive act'" or "any loss, cost or expense arising out of or relating in any way to an 'abusive act.'" (Def. SUMF ¶¶ 12-13, 15; Pl. Resp. SUMF ¶¶ 12-13, 15; Policy at U-GL-1250-A CW 09/05).

An "abusive act" means:

> any act or series of acts of actual or threatened abuse
> or molestation done to any person, including any act
> or series of acts of actual or threatened sexual abuse
> or molestation done to any person by anyone who

---

[4]    Child M's complaint does not plead specific causes of action. The parties seem to agree, however, that Child M intends to assert claims for negligence and intentional or negligent misrepresentation. *See Child M. v. Fennes*, Docket No. A-0873-15T2, 2016 N.J. Super. Unpub. LEXIS 1955 (App. Div. Aug. 25, 2016) (affirming and reversing in part trial court's grant of summary judgment on Child M's negligence and intentional or negligent misrepresentation claims against Montville).

causes or attempts to cause the person to engage in a sexual act:

    a. Without the consent of or by threatening the person, placing the person in fear or asserting undue influence over the person;

    b. If that person is incapable of appraising the nature of the conduct or is physically incapable of declining participation in or communicating unwillingness to engage in the sexual act; or

    c. By engaging in or attempting to engage in lewd exposure of the body done with intent to arouse or to satisfy the sexual desire of any person.

(Def. SUMF ¶ 16; Pl. Resp. SUMF ¶ 16)

A second provision, the Abusive Act ("AA") Coverage Part, does provide insurance for "'loss because of 'injury' resulting from an 'abusive act.'" The definitions of "abusive act" in the CGL Coverage Part and the AA Coverage Part are identical, with one exception: the AA Coverage Part definition (because it grants, rather than excludes, coverage) requires that the abuse or molestation result in injury.[5] The AA Coverage Part, however, contains an exclusion of its own. There is no coverage under the AA Coverage Part for "any claim or 'suit' based upon, arising out of or attributable, in whole or in part, to any 'abusive act' of which any insured, other than the insured actually committing the 'abusive act', has knowledge prior to the effective date of this Coverage Part."[6] (Def. SUMF ¶¶ 18-20, quoting Policy § I.1.a., I.2.d., U-GL-1275-A CW (04/2006); Pl. Resp. SUMF ¶¶ 18-20; Policy § V.1, U-GL-1275-A CW (04/2006)

---

[5]     Injury here means essentially the same thing as "bodily injury" as defined in the GCL Coverage part. (Policy § V.3, U-GL-1275-ACW (04/2006) ("'Injury' means physical injury, sickness, disease mental anguish, mental injury, shock or fright or death of the person(s) who is the subject of the abusive act.")

[6]     A third provision, the Alleged Participant Coverage Part, provides coverage to the insured *person* (not, *e.g.,* a school district) actually committing the abuse. (Def. SUMF ¶¶ 21-23; Pl. Resp. SUMF ¶¶ 21-23) The Alleged Participant Coverage Part is not at issue in this case.

The effective date of the policy at issue in this case, CPO 3701598-07, is July 1, 2011. (Policy p.1 U-GL-D-1115-B CW (09/04)[7]

## C.     Zurich Disclaims a Duty to Defend

About a week after Child M filed her third amended complaint, on January 29, 2015, Zurich sent Montville a letter disclaiming and reserving its rights under the CGL and AA Coverage Parts. As Zurich saw things, it had no obligation to defend or indemnify Montville under the GCL Coverage Part because any "bodily injury" suffered by Child M arose out of or related to "abusive acts." As for the AA Coverage Part, Zurich observed that Child M alleged that Montville knew about prior abusive acts committed by Fennes against Montville students but failed to report to them to the proper authorities or disclose them to potential employers. That allegation, according to Zurich, brought Child M's lawsuit within the "prior known abusive acts" exclusion of the AA Coverage Part. (Def. SUMF ¶¶ 25-26; Pl. Resp. SUMF ¶¶ 25-26)

For the same reasons, Zurich again stated that it had no duty to defend Montville in two more disclaimer letters, dated March 6, 2015, and April 8, 2015. (Def. SUMF ¶ 27; Pl. Resp. SUMF ¶ 27)

## D.     The Child M Litigation Proceeds

On August 14, 2015, Montville filed a motion for summary judgment in the Child M litigation. Although Montville succeeded in obtaining dismissal of all claims against it, the Appellate Division reversed that summary judgment ruling in part.

---

[7]     That is the only policy at issue here because Child M alleges that she was sexually abused in February 2012. For there to be coverage under either the CGL Coverage Part or the Abusive Act Coverage Part, there must be "bodily injury" caused by an "occurrence" or an "abusive act" resulting in an "injury" during a policy year. (Policy § I.1.b(2), CG 00 01 12 07; § I.1.b., U-GL-1275-A CW (04/2006). Montville challenges Zurich's disclaimer of its duty to defend under the July 2011-July 2012 policy.

With some understatement, the Appellate Division called the facts of the case "troubling" and summarized them thus:

> Viewed in a light most favorable to plaintiffs and Cedar Hill, the record reveals that as of 2005, Montville knew that Fennes was engaged in inappropriate physical contact with female students. Among other things, Fennes had female students sit on his lap; allowed them to touch his legs, thighs and buttocks; kissed them and allowed them to kiss him; threatened them not to tell anyone; and told them they would get into trouble or he would not like them anymore or hold their hands if they told anyone. Fennes received several warnings from his supervisors that his conduct was inappropriate and must be corrected, but Fennes responded that he was an "affectionate person and [cannot] change" and "was not going to stop cold turkey."

> Fennes' inappropriate conduct continued despite his supervisors' warnings and three reports to the New Jersey Department of Children and Families, Division of Youth and Family Services (Division) about his inappropriate conduct made prior to his suspension in March 2010. The first report was on June 20, 2008 by an anonymous caller. Although the Division determined the allegation of child abuse was unfounded and closed the case, the principal of Williams Mason, Stephanie Adams, met with Fennes in September 2008, and warned him that his conduct was "inappropriate and unacceptable" and that "under no conditions was it appropriate" to have physical contact with students.

> Fennes did not heed Adams' warning because eight months later, on June 5, 2009, she entered his classroom and saw three female students sitting on his lap. Adams also received a message from a staff member reporting a similar encounter with Fennes, and a letter from a parent reporting that Fennes had inappropriately touched her daughter. On July 14, 2009, Adams contacted the Division. She reported what she saw on June 5, 2009, and what the staff member said, but did not mention the parent's letter. Adams also indicated that "[t]he children didn't

disclose any sexual abuse." The Division concluded that no action was required and closed the case.

On July 15, 2009, Adams issued a letter of reprimand to Fennes and advised him she was recommending the withholding of his salary increment for the 2009-2010 school year. On August 20, 2009, Montville notified Fennes that his salary increment for the 2009-2010 school year was being withheld because of his "inappropriate interactions with students in [his] classroom."

The salary increment withholding did not deter Fennes because on March 1, 2010, a parent reported to Montville that she and other parents had observed and were concerned about his inappropriate physical contact with female students. The parent "implored [Montville] to have this situation investigated immediately for the safety of our children." Thereafter, on March 11, 2010, a third report about Fennes was made to the Division by an anonymous parent. The Division concluded the allegations were "unfounded" and closed the case.

On March 12, 2010, Montville suspended Fennes from his teaching position with pay and began an investigation. During the investigation, Montville received new reports about Fennes' inappropriate physical contact with female students. For example, a parent reported that Fennes constantly held his daughter's hand, picked her up to hug her, and sent her text messages even after he asked Fennes to stop sending them. Another parent reported that a student saw Fennes holding a female student's hand, patting her on the buttocks, and hugging her. A third parent reported that many parents were very concerned about the welfare of a female student after observing Fennes' inappropriate behavior with her. The parent also warned Montville that "God forbid [Fennes] hurts a child in the future, the entire school system will have charges pressed against them for not taking the appropriate actions in seeing [Fennes] removed from the classroom and as a track coach." A grandparent reported Fennes' inappropriate conduct with her granddaughter and stated, "I beg [Montville] to really look into this thoroughly before something very serious happens."

Montville also received a letter from a teenaged student who was coached by Fennes reporting his inappropriate conduct with "[her] little sister." The student said that her sister went to Fennes' home, where he had a room upstairs that "had all children decorations in it" and "a shelf filled with toys" and the sister "acted like it was her room[.]" Montville also received statements from numerous William Mason staff members about their interactions with Fennes and their observations of his inappropriate physical contact with female students.

Montville never reported this new information to the Division and never filed tenure charges against Fennes. Instead, on May 14, 2010, Montville and Fennes entered into an Agreement and Release, wherein the parties agreed that Fennes would resign, effective June 30, 2010, and never seek employment with Montville "in perpetuity" (the Agreement). Regarding references to future employers, Montville agreed to the following:

> Upon direct inquiry by any future employers, [Montville] or its agents will provide the dates of [] Fennes['] employment with [Montville], the position he held in the District, including coaching positions, and that his last day of employment . . . was June 30, 2010. *No further information will be provided.* All calls from prospective employers will be directed to the Superintendent or his/her designee.

[(Emphasis added.)]

The Agreement also provided that "[t]he parties acknowledge that because tenure charges were not filed against [] Fennes, his resignation does not fall within the reporting requirements of N.J.A.C. 6A:9-17.4."

On May 14, 2010, Fennes resigned, effective June 30, 2010. On August 13, 2010, he applied for employment with Cedar Hill as a first-grade teacher. Nandini Menon, the owner/director of Cedar Hill, interviewed Fennes and later obtained his list of references, which did not include anyone employed by Montville. Menon admitted that she contacted Montville to verify his dates of employment and only asked for and received

those dates. Menon also admitted that she never asked
Montville for any documentation about Fennes; never
asked Montville any questions beyond verifying
Fennes' dates of employment; did not recall the name
or title of the person to whom she spoke or verified this
person had the authority to provide information about
Fennes; never questioned the fact that Fennes did not
provide references from persons employed by
Montville; and never asked Fennes for references from
Montville colleagues or supervisors.

Fennes began teaching at Cedar Hill in September
2010. On October 19, 2010, Cedar Hill received
information that: Fennes was the subject of many
parental complaints while employed with Montville;
Fennes had been investigated by the Division; and
Fennes resigned in anticipation of being terminated for
inappropriate behavior around children. Cedar Hill did
not contact Montville about this information and
permitted Fennes to continue working there.

In February 2012, Fennes allegedly sexually abused
Child M. He was subsequently indicted for sexually
abusing and endangering the welfare of Child M. and
several female students from Montville, and his
teaching certificate was suspended.

*Child M. v. Fennes*, Docket No. A-0873-15T2, 2016 N.J. Super. Unpub. LEXIS
1955, *2-8 (App. Div. Aug. 25, 2016) (alterations and emphasis in original).

On this record, the Appellate Division ruled that Montville "had a duty
to take active steps to lessen the risk of harm to the female children by
reporting Fennes to the Division and the Board Examiners." *Id.* at *14. As to
the issue of causation, the court concluded that "[a] reasonable jury could
conclude that Montville negligently failed to take steps that would have
deterred or prevented Fennes from obtaining employment at another
elementary school and negligently shielded him the disclosure of his deviant
conduct with female students." *Id.* at *17. Because Cedar Hills never asked for
additional information about Fennes's character, however, the Appellate
Division affirmed the trial court's dismissal of Child M's claims against

Montville to the extent they were based on an intentional or negligent misrepresentation theory. *Id.* at *17–18.

### E. This Case

While the Appellate Division appeal was pending, on June 22, 2016, Montville filed this coverage action against Zurich. Originally, this action took the form of an Order to Show Cause in New Jersey Superior Court seeking a declaration that Zurich owed Montville a duty to defend it under the CGL Coverage Part. In July 2016, Zurich removed the case to this federal court on grounds of diversity jurisdiction. *See* 28 U.S.C. § 1332. On July 29, 2016, Zurich answered the complaint. (ECF No. 1, Ex. B.; ECF No. 3)

On August 23, 2016 (just two days before the Appellate Division decision, as it happened), the parties submitted to this Court a joint scheduling order in which they proposed trifurcation of the case. Because the duty to defend is broader than and prior to the duty to indemnify, the parties agreed that litigation of the duty to defend should occur first. (ECF No. 8)

Montville filed in this Court a motion for partial summary judgment regarding the duty to defend on November 22, 2016. Zurich cross-moved for summary judgment on December 16, 2016. (ECF Nos. 14, 17, 20)

In January 2017, Montville represented in a letter to this Court that an appeal of the Appellate Division's decision to the New Jersey Supreme Court had been concluded (by implication, in Child M's favor)[8] and that a state-court trial of the Child M case was likely to be scheduled soon. (ECF No. 21)

## II. DISCUSSION

### A. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[8]    Neither WestLaw nor LexisAdvance indicates any subsequent history for the Appellate Division decision, however.

to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is appropriate where "there is no genuine issue of material fact to be resolved and the moving party is entitled to judgment as a matter of law."); *Alcoa, Inc. v. U.S.*, 509 F.3d 173, 175 (3d Cir. 2007). Summary judgment is desirable because it eliminates unfounded claims without resort to a costly and lengthy trial, *Celotex*, 477 U.S. at 327, but a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468-69 (D.N.J. 2002) (citing *Weissman v. U.S.P.S.*, 19 F. Supp. 2d 254 (D.N.J.1998)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Philadelphia Housing Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir.1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

## B.    Analysis

There is only one question in this case: Does the Child M state court litigation against Montville assert claims "arising out of or in any way relating to an 'abusive act'"?[9] If so, Zurich does not have a duty to defend Montville in that case; if not, Zurich does have a duty to defend.

Guiding the duty-to-defend analysis are some well-established principles:

> "[T]he duty to defend comes into being when the complaint states a claim constituting a risk insured against." Whether an insurer has a duty to defend is determined by comparing the allegations in the complaint with the language of the policy. When the two correspond, the duty to defend arises, irrespective of the claim's actual merit. If the complaint is ambiguous, doubts should be resolved in favor of the insured and thus in favor of coverage. When multiple

---

[9]    This exclusion, cited above, is contained in the GCL Coverage Part, which does not really seem to be designed to cover sexual abuse at all. A question arises as to why Montville is attempting to shoehorn its claim into the GCL Coverage Part. After all, Montville purchased abusive acts coverage separately in the AA Coverage Part. And it concedes that it purchased that AA coverage because the abusive act exclusion in the CGL Coverage Part is essentially a "blanket exclusion." (Pl. Reply. Br. 12)

The explanation would seem to lie in the "prior known acts" exclusion of the AA Coverage Part. Montville cannot avail itself of the AA coverage it purchased, because Zurich did not agree to insure Montville for abusive acts it knew about *before* the effective date of the policy, *i.e.*, July 1, 2011. And Montville's prior knowledge is the very essence of Child M's claim against it.

When Montville originally filed this coverage action in New Jersey Superior Court, it relied solely on the GCL Coverage Part. (ECF No. 1, Ex. A) It did the same in its motion for summary judgment in this Court. Now, in response to Zurich's cross-motion for summary judgment, Montville makes a terse claim of coverage under the AA Coverage Part. (Pl. Reply Br. 11-12) That contention lacks merit.

Without citation, Montville states that the "prior known acts" exclusion applies only to abusive acts which it actually committed or participated in. (*Id.*) There is no such limitation in the language of the exclusion, however. The exclusion broadly applies to "*any* claim or 'suit' based upon, arising out of or attributable, in whole or part, to *any* 'abusive act' of which any insured . . . has knowledge prior to the effective date of this Coverage Part." (Def. SUMF ¶ 20; Pl. Resp. SUMF ¶ 20, quoting Policy § I.2.d, U-GL-1275-A CW (04/2006)) (emphasis added)). I therefore find that Zurich did not wrongfully disclaim under the AA Coverage Part.

alternatives causes of action are stated, the duty to
defend will continue until every covered claim is
eliminated.

*Voorhees v. Preferred Mut. Ins., Co.,* 128 N.J. 165, 173-174 (1992) (internal

citations omitted).[10]

Because this cases hinges on the meaning of an exclusion contained

in a general commercial liability policy, the following principles of interpretation

apply:

Exclusionary clauses are presumptively valid and are
enforced if they are "specific, plain, clear, prominent,
and not contrary to public policy." If the words used in
an exclusionary clause are clear and unambiguous, "a
court should not engage in a strained construction to
support the imposition of liability."

We have observed that "[i]n general, insurance policy
exclusions must be narrowly construed; the burden is
on the insurer to bring the case within the exclusion."
As a result, exclusions are ordinarily strictly construed
against the insurer, and if there is more than one
possible interpretation of the language, courts apply
the meaning that supports coverage rather than the
one that limits it[.]

Nonetheless, courts must be careful not to disregard
the "clear import and intent" of a policy's exclusion,
and we do not suggest that "any far-fetched
interpretation of a policy exclusion will be sufficient to
create an ambiguity requiring coverage," Rather,
courts must evaluate whether, utilizing a "fair
interpretation" of the language, it is ambiguous.

*Flomerfelt v. Cardiello,* 202 N.J. 432, 441-43 (2010) (internal citations omitted).

The CGL Coverage Part broadly provides insurance for claims of

"bodily injury." Everyone agrees that Child M has alleged a bodily injury. (Pl.

SUMF ¶ 9; Def. Resp. SUMF ¶ 9) And Child M has alleged that the cause of

---

[10]     The parties do not dispute that New Jersey law governs the interpretation of
this insurance contract.

that bodily injury was an "act or series of acts of actual or threatened abuse or molestation" by Fennes. (Compl. p. 5 (alleging that Fennes "performed various acts of sexual molestation against" Child M)) What remains is a question of interpretation: Do Montville's alleged acts or omissions, while not abusive acts themselves, nevertheless "arise out of" or "relate to" Fennes's abusive acts?

Surely they do. The GCL Coverage Part states in plain and ordinary language that it excludes claims of bodily injury "[a] arising out of or [b] in any way relating to an 'abusive act.'" Phrase [a] has a broad, well-accepted meaning: "The critical phrase 'arising out of,' which frequently appears in insurance policies, has been interpreted expansively by New Jersey courts in insurance coverage litigation." *Am. Motorists Ins. Co. v. L-C-A Sales Co.*, 155 N.J. 29, 35-56 (1998) (noting that "arising out of" has been defined to mean conduct "originating from," "growing out of," having a "substantial nexus to," "connected with," "had its origins in," "flowed from," or "incident to," to excluded act) (quoting *Records v. Aetna Life & Cas. Ins.*, 294 N.J. Super. 463, 468 (App. Div. 1996) and *Allstate Ins. Co. v. Moraca*, 244 N.J. Super. 5, 13 n.1 (App. Div. 1990)). Phrase [b] is even broader. It applies to any claim for bodily injury that *in any way relates to* an abusive act. The allegations here are that, but for Montville's failures, Child M would not have suffered sexual abuse. Montville allegedly knew that Fennes had abused Montville children and (at best) did nothing or (at worst) took steps to conceal his conduct from potential employers. Those allegations against Montville "arise out of," "originate from," "grow out of," have a "substantial nexus to," "connect with," "have their origins in," "flow from," or are "incident to," Fennes's abusive acts. More generally, they "relate to" abusive acts, not just in "any way," but in *every* way that matters.

Montville cannot really maintain that its potential liability in the Child M litigation does not *relate in any way* to abusive acts. Montville's alleged knowledge of, and silence about, Fennes's abusive acts against Montville students are alleged to have facilitated Fennes's predations at Cedar Hill. To be sure, Montville did not itself commit the acts of abuse against Child M—it is a

school district, not a person. But the policy language contains no basis to carve out cases in which the insured's liability arises from its own negligent or intentional conduct which enabled or contributed to a natural person's commission of an abusive act.[11]

A related line of argument emphasizes that Fennes was not employed by Montville when he allegedly abused Child M. "Abusive acts," however, are not defined to include only those committed against Montville students. Far from it: An abusive act is "any act or series of acts of actual or threatened abuse or molestation done to *any person by anyone*." (Def. SUMF ¶ 16; Pl. Resp. SUMF ¶ 16) Any claim for bodily injury "arising out of or in any way relating to an abusive act" is thus excluded from coverage without reference to the identity of the assailant or victim, their relation to each other, or their relation to Montville. For purposes of the abusive-acts exclusion, it does not matter that Montville no longer employed Fennes or that Child M was not a Montville student.

---

[11]    Montville cites *Nationwide Mut. Fire Ins. Co. v. Pipher*, 140 F.3d 222 (3d Cir. 1998), which has some factual parallels to this case but does not involve the same interpretive issue. In *Pipher*, the insured, a landlord, allegedly was negligent in hiring a painter who killed a tenant. The case rested, not on the definition of an "abusive act," but on the definition of an "occurrence." An insurable occurrence is essentially an accident; the definition reflects a general wariness about insuring a party against its own intentional acts. The Court of Appeals recognized that the direct cause of the tenant's death was not an accident, but a third party's intentional act; nevertheless, judged from the perspective of the insured landlord, the insured risk was one of negligence. The rule, said the Third Circuit, is that "it is the intentional conduct of the *insured* which precludes coverage, not the acts of third parties." *Id.* at 226. Thus, applying Pennsylvania law, the Third Circuit ruled that the term "occurrence" "includes bodily injury or death which is directly caused by the intentional act of a third party, but which is also attributable to the negligence of the insured." *Id.* at 227.

This case, by contrast, involves neither Pennsylvania law nor the meaning of "occurrence." Whether or not sexual abuse is an "occurrence"—and no one seems to be disputing that issue—it is explicitly excluded from coverage under the GCL Coverage Part. That exclusion for "abusive acts" makes no distinction between intentional or negligent abusive acts of Montville, its employees, its agents, or third parties. It simply eliminates *all* abusive-acts coverage from the GCL Part, relegating it to a separately-purchased AA line of coverage that deals with it specifically (and which, for entirely separate reasons, does not apply here).

Montville also leans heavily on the lapse of two years (or more) between Montville's alleged acts or omissions and Fennes's abusive acts at Cedar Hill. That gap, Montville says, belies any "close causal connection and temporal relationship" or "substantial nexus" between its negligent conduct and the abusive acts that caused of Child M's injuries. Thus, it claims, Zurich cannot show that Child M's injuries "arose out of" the abusive act exclusion. One short answer, of course, is that the Appellate Division has already ruled as a matter of law that a jury could find proximate cause under these circumstances. *Child M. v. Fennes*, 2016 N.J. Super. Unpub. LEXIS 1955, *17.

But to really understand what Montville means—and why it is mistaken—requires a discussion of *Flomerfelt v. Cardiello*, 202 N.J. 432 (2010), which Montville cites in support of its argument. In *Flomerfelt*, the New Jersey Supreme Court considered the meaning of "arising out of" in a policy exclusion when a "claim for a personal injury asserts multiple possible causes and theories for recovery against the insured," some of which are covered but others not. *Id.* at 454. The plaintiff in the underlying suit in *Flomerfelt* overdosed on alcohol and drugs at a party held by the defendant at his parents' home. The plaintiff sued the defendant for giving her drugs and alcohol and not promptly calling for help when she was found unconscious. The defendant tendered his defense to the carrier of his parents' homeowner's policy. Although plaintiff's complaint referred to both drugs and alcohol, the insurer disclaimed a duty to defend because the policy expressly excluded one of those two causes: claims "arising out of the use, . . . transfer or possession" of controlled substances. The defendant then sought a declaration that the insurer was obligated to defend and indemnify him. *Id.* at 437-39.

The Court ruled in favor of the insured. It conceded that prior cases had deemed the phrase "arising out of" to be "clear and unambiguous" when used in an exclusion. Nevertheless, the Court said, its usual equivalents—"originating from," "growing out of," or having a "substantial nexus"—may apply differently when the actual cause of a plaintiff's injury is unclear. *Id.* at

454. "Originating from" and "growing out of," for example, might exclude coverage only if the plaintiff's drug use had "a close causal connection and a temporal relationship in which the injury is part of a chain of events that began with the use of a drug at a party." *Id.* at 455. "A substantial nexus," on the other hand, might broadly exclude coverage if the drug use was merely "part of interrelated or concurrent causes" of the plaintiff's injury. *Id.* The *Flomerfelt* plaintiff's complaint, moreover, did not specify the precise cause—whether drug use, alcohol use, both, or something else—of her injuries. Applying the usual rules that ambiguity is construed against the insurer and that the duty to defend continues until all potentially covered claims are resolved, the court concluded that the insurer had a duty to defend.

The case of Montville and Child M is plagued by no such imprecisions or ambiguities. The terms of the exclusion here are "specific, plain, clear, prominent, and not contrary to public policy." *Id.* at 441. There is no special circumstance rendering the meaning of "arising out of or in any way related to" ambiguous and requiring that the phrase be construed against Zurich.[12]

Nor is there any dispute about the actual cause of Child M's injuries. The complaint alleges just one: Fennes allegedly "sexually assaulted, inappropriately touched, and otherwise abused" Child M, which caused "severe personal injuries." (Compl. 2, 5, 12-15). The problem tackled by *Flomerfelt*— what to do when "claim for a personal injury asserts multiple possible causes"—is not present in this case. "Abusive acts" are the sole cause of the injury here, and the entire case arises from them. *Flomerfelt*'s discussion of the possible meanings of "arising out of" does not control the straightforward issue of interpretation in this case.

---

[12]    Indeed, as to public policy, Zurich raises the opposite argument. *Failing* to exclude coverage of persons or entities that are complicit in sexual abuse, it says, would violate public policy. Because I ultimately find that Zurich has no duty to defend Montville in the Child M. litigation, I do not reach that argument.

To reiterate, it does not matter, as Montville frequently suggests, that Fennes actually committed the abusive acts while Montville only created the risk that those acts would occur. That Child M seeks to recover from *more than one defendant* based on *more than one theory of liability* is not the same thing as saying that *more than one cause*, one covered and one not, combined to inflict an indivisible injury. That principle—that a court should consider the cause of the injury, not disparate theories of liability, when interpreting "arising out of" language in an exclusion—is implied in much of the case law on this issue.

Here is one example, from the New Jersey Supreme Court. In the underlying suit in *Memorial Properties, LLC v. Zurich Am. Ins. Co.*, 210 N.J. 512 (2012), the defendants, the manager and owner of a cemetery and crematory, were accused of intentionally or negligently allowing a dentist and a "master embalmer" to dissect, harvest, and sell parts of plaintiffs' decedents' corpses. One of defendants' insurance policies included an exclusionary clause that denied coverage for claims of bodily injury "arising out of" the "improper handling" of human remains. "Improper handling" was defined as, *inter alia*, "[f]ailure to bury, cremate or properly dispose of a 'deceased body.'" Defendants claimed that the negligence claims against them fell outside the "improper handling" exclusionary clause, so the insurer had a duty to defend. *Id.* at 518-22.

The court disagreed. True, the manager and owner did not themselves commit any act of desecration. But the allegation that they knowingly allowed the dentist and others access to the decedents' remains—that they played an enabling role in the illegal harvesting scheme—fell "squarely within the parameters of the exclusionary clause." *Id.* at 529. And so, too, did the negligence claim, because "if, as alleged by the families of decedents, negligence in the care or custody of the decedents' remains exposed those remains to illegal harvesting, then the emotional harm consequently inflicted upon the families would '*arise out of* [defendants'] negligence in failing to 'properly

dispose' of their decedents' bodies." *Id.* at 529-30 (emphasis added). Thus, ruled the court, plaintiffs alleged no covered claim, and the insurer did not have a duty to defend.

For purposes of argument, I can even assume that *Flomerfelt* may apply in a case where there is only one cause of a plaintiff's injury. Montville still fails to account for the language immediately following the phrase "arising out of." *Flomerfelt*, 202 N.J. at 452 ("In some cases, an exclusion itself may add other language to the phrase 'arising out of' that will assist in the analysis. . . . In interpreting such language, courts separately consider the meaning of each phrase and then collectively analyze the intent of the exclusion to decide whether the complaint falls within its scope.") The exclusion here also encompasses claims for bodily injury *"in any way relating to"* to abusive acts. From that broad formulation there is no escape.[13]

---

[13]    Montville has a partial fallback position. It suggests that Zurich must defend it from any claim of intentional or negligent infliction of emotional distress ("IIED" or "NIED") under *Abouzaid v. Mansard Gardens Assocs., LLC*, 207 N.J. 67 (2011). Such a claim, Montville seems to say, is independent any of Fennes's abusive acts but still covered as a claim for "bodily injury."

As explained elsewhere in this Opinion, Montville cannot so easily divorce its alleged conduct from Fennes's abusive acts. And even if it could, *Abouzaid* would still be inapposite. The issue in *Abouzaid* was whether, under a "bodily injury" clause, an insurer is obligated to defend its insured for a claim of NIED that did not allege physical injury. Because NIED claims require distress that is extreme, the court ruled, the insurer should presume physical *sequelae* until the issue of physical injury definitively drops out of the case. The IIED and NEID claims here, though, allege both physical and emotional injuries, and stem from the allegation that Fennes "performed various acts of sexual molestation" on Child M. (Compl. pp. 5, 11-15 (incorporating allegations against Fennes and alleging that Montville's negligence or misrepresentations caused Child M. "extreme emotional distress," as well as "severe personal injuries.") Zurich therefore has no duty to defend Montville from an *Abouzaid*-type emotional distress claim.

I note in passing that such an emotional distress claim, if asserted, might nevertheless have fallen within the definition of abusive acts. That definition includes *threatened* acts of abuse or molestation, which are excluded from coverage. *Cf. Abouzaid*, at 88 ("[A] policy providing coverage for claims of 'bodily injury' will be understood to require a defense from the filing of a [negligent infliction of emotional distress] complaint unless such a defense is specifically excluded by other contract language.").

Interpreted as a whole, the phrase "arising out of or in any way relating to" is broad enough to capture allegations that Montville's failure to alert the proper authorities created a risk that Fennes would abuse future students. It is also broad enough to capture allegations that Montville virtually knew that Fennes would abuse students at other schools when it agreed to keep mum on his past abusive acts in exchange for his resignation.

Comparing the entire language of the exclusion to Child M's allegations, I have no difficulty finding a sufficiently close causal connection between Montville's misrepresentations or negligence and Fennes's abusive, injury-causing acts. As the Appellate Division has already ruled, a properly instructed jury could find proximate cause on these facts. *Child M v. Fennes*, 2016 N.J. Super. Unpub. LEXIS 1955, *17. By either reporting Fennes to the authorities, or at least by not concealing his acts of abuse from Cedar Hills, which hired him, Montville allegedly made the abuse of Child M possible, despite being in a position to prevent it. Abusive acts—those of which Montville was aware from 1998-2010, or those which occurred later, in 2010-2012—are the foundation of Montville's liability to Child M. A lapse of two years is a factual circumstance, not a statute of repose; if the allegations of the underlying complaint are correct, when Montville acted as it did, it knew or should have known that, late or soon, abuse was likely to follow.

In short, the terms of the abusive act exclusion are "clear and unambiguous," and I will not "engage in a strained construction" to support coverage. *Flomerfelt* 202 N.J. at 442. Comparing the Montville's policy to the complaint, there is no doubt that the parties expected and intended to exclude coverage for such claims under the GCL Coverage Part.

\* \* \*

To recap: Montville's policy with Zurich unambiguously excludes claims for bodily injury that arise out of or in any way relate to abusive acts. Child M alleges that Fennes sexually abused or molested her, and that

Montville knew that he had done the same to previous students. The claim is that if Montville had reported Fennes to the appropriate authorities or told potential employers what it knew, Child M would not have been abused. Setting the terms of the policy alongside Child M's complaint, I must conclude that such allegations arise out of are related to abusive acts, and therefore are well within the bounds of the "abusive act" exclusion. Zurich has no duty to defend Montville.

## III.  CONCLUSION

For the foregoing reasons, Montville's motion for summary judgment is DENIED, and Zurich's cross-motion for summary judgment is GRANTED.

Dated: June 1, 2017

**KEVIN MCNULTY**
**United States District Judge**